Todd *v*. Ford et al.

No. 12,408.

Wright, Administrator *v*. Ford et al.
(21 P. [2d] 173)

Decided April 10, 1933.

Messrs. McMullin, Sternberg & Helman, Messrs. Lee, Griffith & Aldrich, for plaintiffs in error.

Messrs. Vincent & Bowie, for defendants in error.

*En Banc.*

Mr. Justice Hilliard delivered the opinion of the court.

A Suit by certain certificate or unitholders of a common law trust, suing for themselves and similar holders, against plaintiffs in error, and others, as trustees of the trust, for an accounting and consistent further relief. The trust, called Stump Oil and Refining Company, was made a party defendant. Accounting was had and judgments in severalty were given against plaintiffs in error. They sued out separate writs of error, but their assignments are identical, and the matter is presented on a single record. We dispose of the writs in one opinion.

The plaintiffs in the suit, defendants in error here, alleged that they severally owned and held beneficial equitable interests in the defendant trust organization, which existed by virtue of a declaration of trust executed in March, 1920, and an amended declaration executed in June, 1920, and of which the individual defendants were trustees; that the amendatory declaration increased the capital from $200,000, divided into units having a par value of $50 each, to $500,000 of like division and par, evidenced by transferable certificates; that the defendants Bailey and Todd, plaintiffs in error, and McCary and Mantey, also defendants below, and one H. W. White, who was not sued, were the trustees of the trust, and having certain enumerated duties; that the properties of the trust, described, were held by defendants and White, as trustees; that the units of the trust were sold for capital funds with which to pay for its properties and develop same; that shares were sold to plaintiffs under representations that the trustees held contracts to purchase leases of 195 acres of valuable oil lands in Wichita county, Texas, known as the ''Connor'' leases, for $150,000; that the then developed oil wells thereon would pay 25 per cent on the investment; that units were being

sold for financing the property specifically mentioned; that no promotion or commission units would be issued, or for selling the units or shares; that no salaries, commissions for the sale of units, or other compensation would be paid to the trustees, and that said trustees had invested their own money on the same basis of price and conditions as had other purchasers of units then being offered for sale; that 50 per cent of all net profits would be paid to unitholders, and remaining profits used for further development of the property; that books of the company would be open at all times to unitholders, all of which plaintiffs believed and on which they relied; that the aforesaid statements were falsely and fraudulently made, and the defendant trustees were guilty of violating said trust; that defendant trustees issued certificates for units approximating 5,100, having a par value of $255,000 and received therefor approximately only $194,000; that defendant trustees issued to themselves and their families certificates for units to a par value of many thousands of dollars, without consideration; that the total paid by defendant trustees for units amounts to approximately $8,000, and that said trustees have paid to themselves and members of their families on shares so issued without consideration dividends of 45 per cent, in the aggregate amounting to more than 200 per cent, of their actual investment; that said defendant trustees paid to themselves in salaries several thousands of dollars and concealed the fact from plaintiffs; that some $48,000 was expended outside the enterprise intended to be developed; that defendant trustees had not made accurate reports, having omitted therefrom records showing commissions paid to themselves on sale of said certificates, thus fraudulently concealing said transactions; that defendant trustees subscribed to units in the trust, said subscriptions becoming assets of the trust and later secretly cancelled and concealed same by omitting to record them in the books; that the properties held were sold in 1923 for $114,750; that altogether dividends

of 45 per cent had been paid unitholders and there remained for distribution approximately 5 per cent; that after said sale plaintiffs had demanded of the trustees an accurate and full report of receipts and expenditures, including a particular account of commissions paid for sales of units, and the persons to whom paid; that defendants rendered a statement, but that said report was untrue, false and misleading, in various particulars; that said report concealed or omitted salaries paid to defendants; that said false entries and omissions involved many thousands of dollars; that after having received said report plaintiffs demanded a complete, detailed and accurate report, which defendants refused to give, and refused to permit plaintiffs to examine the books; that for the reasons appearing defendant trustees are indebted to the trust in many thousands of dollars; and that plaintiffs are without a plain, speedy or adequate remedy at law.

Defendants interposed motions to strike portions of the complaint, and in particulars to make it more definite, and on disposition of the motions, granted in part, demurrers were filed and overruled. The defendants then answered, and so far as material here, after admitting formal allegations, specifically denied all allegations of wrongdoing; and affirmatively alleged that White, not sued, at all times of which plaintiffs complained, was a trustee and that he had taken an active part in the business and management of the trust, and not opposed the acts of the trustees complained of; that defendants had kept correct books of account, made full and accurate report to unitholders at all times, and in October, 1923, a correct audit of the books was made and rendered to plaintiffs, and other unitholders; and that in February, 1924, an accountant hired by plaintiffs examined all said books and accounts. For a second defense it was alleged that in 1919, one Stump and one Boatright had contracted to purchase the Connor leases for $150,000, payable as follows: $5,000 December 27, 1919; $5,000 Janu-

ary 20, 1920; $7,500 February 24, 1920; $61,250 April 1, 1920; $21,250 May 1, 1920; and $50,000 June 1, 1920; that Stump and Boatright had never perfected an organization, but had nevertheless sold a large number of units therein; that Bailey, Todd and White executed the declaration of trust, and that they assumed the management of the trust, and showed the necessity of raising large sums of money to save the leases; that they caused a meeting of the trustees to be held in Grand Junction about March 15, 1920, at which were present some of plaintiffs; that at such meeting plans for raising money were discussed, and it was there decided to employ one Glasco as fiscal agent; that it was to pay him 15 per cent on units sold in Grand Junction and 20 per cent on all outside, 5 per cent of which to constitute an overriding commission to Glasco, and 10 per cent and 15 per cent, respectively, ordinary or regular commission, to be retained by the fiscal agent, or paid to sub-agents, and that any stockholder, including trustees, might sell and earn commissions; that Stump and Boatright had resigned, and Manty and McCary had been installed as trustees in their stead; that meetings had been called with unitholders to discuss the company's progress and affairs from time to time, which plaintiffs or some of them attended, none of whom objected to what was being done or projected by the trustees; but, on the contrary, they acquiesced in and sanctioned the entire plan, by virtue whereof they were estopped from asserting fraud or mismanagement; and that the trustees had fairly and fully performed their duties. For a third defense, under similar allegations, and alleging that when the complaint was filed they were ready to wind up the affairs of the trust and make final distribution to the unitholders, they pleaded laches. For a fourth defense, after adopting by reference their first defense, they pleaded the terms of the trust declaration, which, they said, constituted the agreement between the trustees and plaintiffs, and other

unitholders. The following are excerpts from the declaration so pleaded:

a. That trustees should hold legal title to properties with the powers and limitations therein declared. The right of said trustees to manage, control, administer and dispose of the trust estate shall be absolute, unconditional and free from the control and management of the shareholders, who shall have only the rights specifically set forth in said declaration of trust.

b. That the ownership of shares of beneficial interest in the trust estate shall be evidenced by certificates and that any person, firm or corporation, acquiring shares in this trust assents to, accepts and approves all the terms, conditions and agreements contained in the declaration of trust, and all amendments thereto, and from the date so received, the declaration of trust shall have like binding force and effect upon him as if he were one of the original parties thereto.

e. At each regular annual meeting of trustees, they shall require the officers to submit a full statement of the conditions of the trust, and all business transacted by it, and when said statement is approved, shall cause a copy of same to be sent to each owner of one or more shares in this trust. The books and records of trust shall be open to inspection by any such owner at all reasonable times and places.

f. The shareholders in this trust shall have no legal right to the property of the trust now held or hereafter acquired, but the shares shall be personal property, carrying the right of division of profits when dividends are declared by the trustees, and on final settlement a division of the principal and profits.

g. It shall be the duty of the trustees faithfully and diligently to administer this trust, to keep correct and accurate records of all business transacted, and to exercise prudence and economy in the business of the trust; to act in good faith, and only for the best interests of the trust; to annually render a full and correct account of

the trust business, and at the termination of the same, to render up and deliver all the properties and funds of the trust as would diligent and prudent men acting in their own behalf.

h. Trustees or agents or servants actively engaged in administering this trust shall be entitled to reasonable compensation. Each trustee shall be responsible only for his own willful and corrupt breach of trust, and not for any honest error of judgment and not for one another.

Defendants further alleged a fair compliance therewith, that they had rendered full and correct accounts, were under no obligation to do any further act except to make final distribution of the funds remaining, less reasonable compensation to trustees, and denied any indebtedness whatever. Plaintiffs replied at length, but their pleading served only to make plain the issues, and need not be noted in detail.

On evidence taken at a preliminary hearing the court required defendants to account, and appointed C. H. Stewart, Esquire, as referee, to hear testimony, make findings of facts, determine questions of law, and recommend judgment and decree. In simplification of such hearing it was stipulated that the testimony and accounting to be made should be confined to: (1) Representations that all proceeds from stock sales would be used to develop the Connor leases only, and consequent liability for monies otherwise spent. (2) Representations that half of the net returns from gas and oil produced would be distributed as dividends, and consequent liability for money otherwise spent to the extent of said half. (3) Liability of defendants Bailey and Todd for par value of certificates issued to themselves and later cancelled. (4) Liability of defendants for salaries drawn by them. (5) Liability of defendants for commissions on stock issued, claimed and appropriated by them.

The referee found against plaintiffs as to items 1, 2, 3 and 4, except that on item 4 he charged Bailey with

$1,480, paid him for field services in development work in Texas.

As to item 5, the referee found that after the settlement with Stump and Boatright, about March 9, 1920, Bailey, Todd and White were trustees on the ground, and that Stump and Boatright had no active part in the company's affairs; that White, a physician, was largely occupied otherwise, and that Bailey and Todd practically had sole responsibility and management; that during this period the greater part of the units were sold, certificates issued and sale price collected. Generally, the referee found that records kept early in this regime were of little value, but that from May 8, 1920, when one Ragan, an accountant, on information given him by Bailey orally, opened books for the trust, no criticism attended. In the books thus opened Bailey and Todd were credited with commissions, 15 per cent on sales made in Grand Junction and 20 per cent when made outside that city. These credits included 5 per cent as overriding commission, the same as previously allowed Stump and Boatright on sales made by them, and to Glasco, appointed as fiscal agent when the active management was taken from Stump and Boatright. On the whole, in addition to finding against Bailey for $1,480, as previously noted, the referee, although he found the commissions claimed by Bailey and Todd were reasonable, determined there was lack of authorization for payment, and recommended that they be jointly and severally held for the sum of the commissions, usual and overriding, retained by them, computed in the sum of $19,326.05, with interest from November 1, 1920. McCary and Mantey were absolved from liability and Bailey and Todd from corrupt motives or intent to defraud.

On objections by Bailey and Todd, the court rejected much of the referee's unfavorable report, and so modified the remainder that instead of separate judgment against Bailey in the sum of $1,480 and a joint and several judgment against Bailey and Todd for $19,326.05, as recom-

mended by the referee, the item of $1,480 was eliminated, and separate judgments, in greatly reduced aggregate, were given against Bailey and Todd, the genesis of the adverse judgments, as we understand the record, being the court's rejection of Bailey and Todd's claims for overriding commissions. This construction of the record is shared by counsel for defendants in error, who say in their brief that "it will be observed that the principal question presented is whether the defendants were properly held liable for overriding commissions taken by them, and that the other issues are largely incidental and subject to the determination of that proposition." It will be noted that defendants in error did not file objection to the referee's findings, and do not present cross assignments here.

Originally, as we have seen, Stump and Boatright had bought the Connor leases, for the total sum, and to be paid at times and in amounts as already indicated; that contrary to the fact Stump and Boatright represented that a common law trust had been organized, in which they sold units or shares, many, and principally, to Bailey, Todd, White and other Grand Junction purchasers; that on investigation these holders learned that not only had the claimed trust not been created, but that Stump and Boatright had collected much money, for which, in a considerable amount, they were unable to account, and had not kept up payments on the leases; that with the consent of Stump and Boatright the Grand Junction parties took charge, formed the trust previously thought to have been created, in which Bailey, Todd, White, Stump and Boatright were named as trustees, but in relation to which the last two were to have only nominal connection; that Stump and Boatright, after being allowed regular commissions, 10 per cent and 15 per cent, were allowed an overriding commission of 5 per cent, and to the extent the net accounting required from them could not be discharged in cash, their note was taken and paid; that the trustees, Bailey, Todd and

White (Stump and Boatright taking no part, as was the intention), finding that due to failure of the trust to keep up payments as agreed, the leases were in jeopardy, entered into an agreement with Glasco whereby the latter became fiscal agent for the trust, his undertaking being to sell units and raise money in amounts and with sufficient celerity to meet the requirements of the purchase contract, for which he was to have as regular commissions 10 per cent for sales in Grand Junction, 15 per cent otherwise, and 5 per cent additional, known as overriding commission, the contemplation being that however the sales were accomplished, through the fiscal agent's own or sub-agents' efforts, the 5 per cent would be added compensation to him; that after a time it appeared that Glasco either could not or would not raise the money as required, and on complaint he resigned; that thereupon Bailey and Todd, residents of Grand Junction, the home of the trust, who, to raise money to meet accruing payments on the purchase, had endorsed for the trust notes at banks in large amounts, were fearful that impending defaults would be disastrous to the trust, communicated the facts to trustee White, residing in a near-by city, and suggested that they three undertake the task which Glasco had laid down; that White, who is a physician, claiming that on account of his professional duties he could not engage actively in a selling campaign which they all deemed necessary to the preservation and development of the trust estate, declined to have part in the responsibility, but agreed that Bailey and Todd, as they testified, should take up the work on the terms enjoyed in the first instance by Stump and Boatright, and later by Glasco. In some particulars White's testimony may be said to conflict with what Bailey and Todd said, but mainly, as we view the record, he corroborated them. His recollection of the agreement was that unitholders, trustees and all, should have 10 per cent commission for sales of units, and that Bailey and Todd, who, as White does not dispute, were to assume the responsibility

theretofore borne by Glasco and give full time to the business of the trust, were to have no more. The record does not bear out such conclusion, nor, as the undisputed testimony shows, would 10 per cent be reasonable compensation for the service they rendered. White admits that subsequently, as a trustee, he demanded the right to share in the overriding commissions, but that Bailey and Todd denied his request on the ground that he had not given his time to the matter. In that conclusion White says he "acquiesced under pressure." Fair comment would be that the only apparent pressure was the logic of the situation. The requirements of the trust at the time, and the necessity for immediate and sustained fiscal service, plainly recognized by all three of the active trustees, add plausibility to the Bailey and Todd version of the affair. Besides, as already noted, the plan which Bailey and Todd say was agreed upon conformed to the arrangement followed from the inception of the trust.

In the end the trustees sold the trust estate, and for less than the purchase price, but no criticism of the sale is made, and fairly it may be said to have been advantageous to the unitholders. Indeed, the record warrants the statement that the trustees, and for the most part Bailey and Todd, manifested business acumen. The sole basis of the judgments against them is the court's conclusion that since they were trustees, they were without right or authority to have or retain overriding commissions. We think the court erred. There was nothing inherently wrong in the trustees receiving what had been paid others for the identical service. It may well be borne in mind that many, and perhaps all, of plaintiffs, as well as a preponderating number of unitholders, including trustee White, operated as agents under Bailey and Todd, and were paid commissions, not a few receiving large sums for such service. Briefly, all those who now protest, as well as those against whom the protest is directed, trustees and other unitholders alike, did sell units in the trust,

and claimed and received commissions, the practice apparently being generally recognized as legitimate and in the interest of the ultimate purpose of the trust. The referee, although he found that what Bailey and Todd claimed was reasonable in percentage and amount, and absolved them from wrongdoing, concluded, nevertheless, that since they were trustees of the trust they were not entitled to commissions, usual or overriding, while the court differentiated between the kinds of commissions claimed, and adjudged them liable only for the overriding item.

The declaration of trust provides that "each trustee shall be responsible only for his own willful and corrupt breach of trust," and must "act in good faith." Plaintiffs in error were absolved below from any such breach, and their good faith was not successfully challenged. The certificates on which defendants in error based their suit contain the statement that they were "issued subject to the provisions and covenants" of the association. We have held in like situation that the declaration of trust mentioned in the certificates binds the unitholders. *Wimer & Co. v. Downs*, 77 Colo. 377, 237 Pac. 155. Since no fraud or overreaching was shown, it follows that the rights and liabilities of all the parties to the trust, unitholders and trustees alike, must rest on the provisions of the declaration of trust. The declaration provides that trustees actively engaged in administering the trust shall be reasonably compensated. Whether White agreed that Bailey and Todd should take up the burden of the fiscal operations of the trust or not, they did perform the service, as is conceded. For such active service in behalf of the trust Bailey and Todd claimed only such commissions as had previously been allowed others working to the same end. The so-called overriding commission, 5 per cent, which the court denied to them, was practically all Bailey and Todd received, for the general or usual commissions went largely to sub-agents, principally other unitholders and trustees.

■ On the whole, the problem is easy of statement and simple of solution. Were Bailey and Todd disqualified from engaging in the service which constitutes the basis of their claim, and was the compensation demanded by them excessive or unreasonable? The answer to the first part of the question is to be found in the language of the trust document, which is to the effect that trustees may be active in behalf of the trust, and shall be reasonably compensated for their services. 8 Thompson on Corporations (3d Ed.), §6756; 26 R. C. L., page 1391, §257. As to the reasonableness of their demand, three competent and disinterested witnesses testified that the commissions claimed by Bailey and Todd were usual, and not excessive, and none testified otherwise. This, coupled with what had been the trust's course of dealing with others rendering similar service, justifies us in holding that Bailey and Todd sought to retain only reasonable commissions. The suit should have been dismissed, and to that end let the judgments be reversed.